# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-1840-17T2
                A-1841-17T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

J.W.-D. and I.M.,

      Defendants-Appellants/
      Cross-Respondents.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.M.,
and IS.M., Minors,

      Respondents/Cross-Appellants,

and

E.W.,

      a Minor.

_____

Argued March 18, 2019 – Decided April 23, 2019

Before Judges Sabatino and Haas.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0166-16.

Ruth A. Harrigan, Designated Counsel, argued the cause for appellant/cross-respondent J.W.-D. (Joseph E. Krakora, Public Defender, attorney; Ruth A. Harrigan, on the briefs).

Marc R. Ruby, Designated Counsel, argued the cause for appellant/cross-respondent I.M. (Joseph E. Krakora, Public Defender, attorney; Marc R. Ruby, on the briefs).

Todd S. Wilson, Designated Counsel, argued the cause for respondents/cross-appellants (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith A. Pollock, Deputy Public Defender, of counsel; Todd S. Wilson, on the brief).

Mary L. Harpster, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Mary L. Harpster, on the brief).

Karen A. Lodeserto, Designated Counsel, argued the cause for minor E.W. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith A. Pollock, Deputy Public Defender, of counsel; Karen A. Lodeserto, on the brief).

PER CURIAM

In these consolidated appeals, defendant J.W.-D. (the mother) seeks reversal of the Family Part's termination of her parental rights as to her three sons, IS.M. ("Ian"), J.M. ("John"), and E.W. ("Eric") pursuant to N.J.S.A. 30:4C-15.1(a).[1] Defendant I.M., the father of the two older sons (Ian and John), seeks reversal of his parental rights as to them. The father of the youngest son (Eric) is unknown.

A Law Guardian for the two older sons cross-appeals termination of the parents' rights as to the those children, because he contends they would now prefer to live with their mother or an alternative relative rather than remain in foster care in a post-termination "select home adoption" status. The Law Guardian for the younger son, meanwhile, sides with the Division of Child Protection and Permanency ("the Division") in arguing for affirmance of terminating the parents' rights as to that child.

For the reasons that follow, we affirm the trial court's findings as to the termination of the mother's parental rights as to the youngest son, Eric. With regard to Ian and John, we affirm the trial court's findings as to the mother with respect to prongs one and two, and the "services" portion of prong three of the

---

[1] We use initials and pseudonyms to protect the privacy of the children. R. 1:38-3(d)(12).

A-1840-17T2

statutory termination criteria, N.J.S.A. 30:4C-15.1(a)(1) to (3).  However, we remand for further proceedings with respect to the "alternative caretaker" portion of prong three and also as to prong four of the statutory criteria, N.J.S.A. 30:4C-15.1(a)(3) to (4), regarding the mother and the two older sons, particularly as to whether there exists one or more viable alternatives to termination that may impact these sons' best interests.  Lastly, we vacate the trial court's findings as to the father of Ian and John as to all four prongs, because the trial court improperly based those findings essentially upon the father's status as an incarcerated person without sufficient analysis of the legal criteria.

I.

We summarize the procedural history and salient facts that emerged at the two-day guardianship trial in September 2016, and later at the remand proceedings in November 2017.

Ian was born in December 2008 and John was born in December 2009.  Their half-brother Eric was born in November 2014.  The children have spent most of their lives in the Division's care and custody.  The father of Ian and John has been incarcerated since 2010, and he will not be eligible for parole until 2023.  As we have noted, Eric's father is unknown.

4

The mother's own unstable childhood and personal trauma is well-documented in the record. The mother has a long history of mental illness, including conflicting diagnoses of Bipolar Disorder, Borderline Personality Disorder, and Post Traumatic Stress Disorder ("PTSD").[2] She nearly drowned one of the sons during a psychotic episode and has been involuntarily hospitalized for mental health episodes in the past. She has been inconsistent with treatment and has repetitively tested positive for marijuana.

The older sons, Ian and John, were originally removed from the mother's care and placed in a non-relative resource home in September 2012 because the mother was non-compliant with treatment. The mother visited the boys while they were in the Division's custody. She continued to visit them daily when they were placed in the care of C.W., the mother's own maternal grandmother, in May 2013. The boys stayed with C.W. until December 2014, and during that time the mother visited the boys frequently.

Ian and John were briefly reunified with the mother in December 2014, but they were soon removed again, along with the third son Eric, in January

---

[2] The testifying mental health experts disagreed as to whether the mother had bipolar disorder, PTSD, or possibly both. Another, non-testifying, expert diagnosed her with Borderline Personality Disorder. The trial judge did not determine the accuracy of these diagnoses, and nor do we.

2015 because of the mother's non-compliance with treatment. At the January 2015 hearing, the court granted legal and physical custody of Eric – who then was less than two months old – to the Division. Joint legal custody of Ian and John was given to the mother and C.W. The court ordered the mother to attend psychological treatment.

In June 2015, the Division conducted an emergency Dodd[3] removal of Ian and John after the mother had a psychotic episode and had to be hospitalized. C.W. informed the caseworker that she had allowed the mother to take the sons twice a week, apparently in violation of the January 2015 custody order. C.W. also informed the caseworker that she could no longer care at that time for the two boys.

Since the Division's removal, Ian and John, both of whom have significant behavioral problems, have been in approximately four placements. Eric, meanwhile, has been in the home of a resource parent who wishes to adopt him.

The Division offered extensive services to the mother. However, her persisting mental health issues, and her failure to appreciate sufficiently her need to address those issues, continued to be problematic.

---

[3] A "Dodd removal" refers to the emergency removal of a child without a court order, pursuant to the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82. N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011).

At the 2016 guardianship trial, the Division presented testimony from two mental health experts, Dr. Mark Singer and Dr. Alvaro Gutierrez. Those experts opined that the best interests of the children were to terminate the mother's parental rights as to all three sons, and the father's parental rights as to Ian and John. Dr. Singer stated in particular that the mother has been in a "downward spiral."

The Law Guardian, who represented all three sons at trial, presented expert testimony from Dr. Susan Esquilin, who diagnosed the mother with PTSD, but not bipolar disorder. Dr. Esquilin agreed that the mother was not yet fit to care for the boys. However, she recommended that the mother be given more time to establish her fitness and receive dialectical behavioral therapy, which she opined would be more effective than medication alone.

The parents did not testify or present any factual testimony. They did not present any expert witnesses, although the mother relied in part of Dr. Esquilin's testimony.

After considering these proofs, the trial court granted termination in an oral decision on September 14, 2016. Both parents appealed the final judgment.

While that original appeal was pending, this court issued an order on August 10, 2017, granting the parents' unopposed motion to remand the appeal

back to the Family Part, in light of this court's opinion in <u>N.J. Div. of Child Protection & Permanency v. T.U.B.</u>, 450 N.J. Super. 210, 214-15 (App. Div. 2017). Our opinion in <u>T.U.B.</u> declared inapplicable in Title 30 termination cases the hearsay exception under N.J.S.A. 9:6-8.46(a) that allows the admission of certain out-of-court statements by children.

On remand, the same judge who had tried the case in 2016 issued a post-remand decision on November 15, 2017. The judge again concluded that all four prongs of the statute have been met as to both parents by clear and convincing evidence, even disregarding the sons' hearsay statements.

The parties thereafter filed supplemental briefs addressing the remand decision and presented oral argument to this court.

While the current appeal was pending, the Division's attorney submitted a post-judgment letter to this court on April 27, 2018, along with an accompanying certification from the caseworker pursuant to <u>Rule</u> 2:6-11(f). The certification advised that four days earlier, both Ian and John had been removed from the resource home of a family friend – who had initially expressed interest in adoption – and they are placed separately in unrelated resource homes. The caseworker's certification explained that the boys were removed from that resource home "due to their behaviors."

Eleven months later, in March 2019, the Division's attorney advised us at oral argument that the boys' circumstances had further changed. In a follow-up post-argument letter dated March 20, 2019, the Division's attorney advised us that: (1) Eric "continues to do well in his adoptive home"; (2) John remains in a resource home with a resource parent who is "currently not committed to adoption," although John himself "wishes to be adopted into this home," and also that John "continues to have behavior issues at school and it is believed he needs a new school able to meet his [special needs] requirements"; and (3) Ian was placed in a group home in July 2018. The letter further states that, at a hearing in November 2018, Ian "mentioned his maternal great grandmother [C.W.] as a potential adoptive placement."

More recently, on or around March 5, 2019, C.W. had met with the Division and expressed her interest resuming as the sons' caretaker. The attorney's letter indicates the caseworker would like the boys to be placed "together," and the boys indicated they would prefer that course of action.

## II.

As our case law acknowledges, the termination of a parent's rights to raise his or her children raises issues of a constitutional dimension. See, e.g., In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999); see also In re Guardianship

of J.C., 129 N.J. 1, 9-10 (1992). The Legislature has recognized the importance of this constitutionally protected relationship between a parent and a child by imposing a high burden upon the Division to terminate those rights in a guardianship case. That burden calls for the Division to prove, by clear and convincing evidence, the following four prongs under N.J.S.A. 30:4C-15.1(a):

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a); see also N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 604-11 (1986) (reciting the four controlling standards later codified in Title 30).]

On appeal, both the mother and the father challenge the sufficiency of the Division's evidence against them with respect to these statutory criteria. Among other things, the mother contends the trial court should have afforded her more time to demonstrate that she is or will be capable of caring for her three sons. She stresses that, as of the time of the remand proceedings in November 2017, the two older sons were in a "select home adoption" status with no adoptive homes on the horizon. She contends that she has never harmed her sons; that she is not likely to harm them in the future; and that the Division did not make reasonable efforts to assist her with her mental illness. The mother asserts that the children's best interests lie with her remaining in their lives, and that termination of her parental rights will cause the boys more harm than good.

The father likewise contends that the court erred in applying the statutory factors as to the two older sons. Among other things, he asserts that the court unfairly used his incarcerated status as the pivotal basis for terminating his parental rights. He argues the Division failed to provide him with adequate services, including sufficient visitation, and failed to give enough consideration to potential alternatives to termination. He, too, contends that termination of his parental rights would do his sons more harm than good.

A-1840-17T2

Both parents assert that the trial court should have granted the motion of the Law Guardian of Ian and John to supplement the record at the remand hearing to consider additional proofs. They contend such proofs would have shown those sons were unstable, in poor emotional states, in and out of the hospital, and experiencing periods of crisis.

The respective Law Guardians on appeal take divergent positions. The Law Guardian for the youngest son, Eric, maintains that the four statutory criteria were met. She argues Eric's best interests are advanced by terminating his mother's parental rights, to enable his future adoption. By contrast, the Law Guardian for Ian and John urges that the trial court's decision to terminate their relationships with both parents should be reversed, particularly since their foster care placements as of the time of trial were not successful.

In considering these arguments on appeal, we must be cognizant that our scope of appellate review is limited. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007). "Appellate courts must defer to a trial judge's findings of fact if supported by adequate, substantial, and credible evidence in the record." Ibid. An appellate court must also defer to the trial court's credibility determinations, and to the Family Part's special expertise in the field of domestic relations. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J.

527, 552 (2014).  That said, the trial court's interpretation of the law and legal findings are reviewed pursuant to a de novo standard.  Id. at 552.

We have applied these standards to the record and the trial court's findings.  Having done so, we vacate the trial court's decision as to the father with respect to prongs one and two, and affirm the decision as to the mother with respect to those two prongs.  However, we remand this matter as to prongs three and four with respect to whether the present circumstances – including the possibility of a placement of one or more of the children with C.W. – may justify withholding termination.

## III.

As an initial procedural matter, we reject the arguments of the parents and the Law Guardian for the two older boys that the trial court was obligated to reopen the record after this case was remanded for further consideration following this court's opinion in T.U.B.  As we noted in T.U.B., the remand in that particular case left it to the trial court's discretion to consider updated or additional proofs.  T.U.B., 450 N.J. Super. at 246.  The same discretion similarly applies here.

We are unpersuaded the trial court abused its discretion in the present case when it declined on remand to allow supplemental proofs.  The court was already

well aware that the boys have suffered from behavioral problems. The court had been kept apprised by the Division about the boys' struggles. Further evidence of the boys' behavioral problems would not materially affect the termination analysis, which largely turns upon the parents' fitness and their relationship with their sons.

IV.

We turn first to the merits as to the father. We begin that analysis with a exploration of statutory prongs one and two.

The first prong of the statutory best interests test requires that the Division prove that the "child's safety, health or development has been or will continue to be endangered by the parental relationship[.]" N.J.S.A. 30:4C-15.1(a)(1); K.H.O., 161 N.J. at 337, 352. The court will consider physical and psychological harm and, also, emotional injury in the absence of physical harm. See N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 440 (App. Div. 2001) (stating elements of psychological harm). Harm can be inflicted by one egregious event or through an accumulation of events over the course of time. N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 506 (2004). The second prong will be satisfied if the parental relationship will likely cause future harm to the child. A.W., 103 N.J. at 607, 615-16.

A-1840-17T2

The Supreme Court has made it very clear that a parent's incarceration alone is not a sufficient legal basis for termination.  See, e.g., In re of Adoption of Children by L.A.S., 134 N.J. 127, 143 (1993); see also R.G., 217 N.J. at 556 ("We therefore reiterate that incarceration alone – without particularized evidence of how a parent's incarceration affects each prong of the best-interests-of-the-child standard – is an insufficient basis for terminating parental rights."). There is no doubt that "incarceration is a relevant factor in resolving termination of parental rights cases."  R.G., 217 N.J. at 555.  Even so, "'it is by no means settled or obvious that incarceration is so inimical to [the parental] relationship as to justify its termination as a matter of law.'"  Ibid.  (quoting L.A.S., 134 N.J. at 137).

In L.A.S., the Court remanded the guardianship case for the trial court to reconsider whether the defendant father's incarceration was sufficient to terminate his parental rights, "based on either abandonment, parental unfitness, or both."  134 N.J. at 143.  In so doing, the Court instructed the trial court to consider the following factors, which were subsequently reiterated in R.G.:

> [P]erformance as a parent before incarceration, [and] to what extent his children were able to rely on him as a parent;
>
> [W]hat effort, if any, he has made to remain in contact with his children since his incarceration;

[W]hether he will be able to communicate and visit with his children;

[W]hat effect such communications and visitation will have on the children in terms of fulfilling the parental responsibility to provide nurture and emotional support, to offer guidance, advice, and instruction, and to maintain an emotional relationship with his children;

[T]he risk posed to his children by [the parent]'s criminal disposition;

[W]hat rehabilitation, if any, has been accomplished since [the parent]'s incarceration, and the bearing of those factors on the parent-child relationship;

[W]ith the aid of expert opinion, determine the need of the children for permanency and stability and whether continuation of the parent-child relationship with [the parent] will undermine that need; and

[D]etermine the effect that the continuation of the parent-child relationship will have on the psychological and emotional well-being of the children.

[R.G., 217 N.J. at 555-56 (quoting L.A.S., 134 N.J. at 143-44).]

Here, with respect to prong one, the Division stresses that the father's criminal conduct led to his incarceration and unavailability to parent Ian and John. The father contends that the evidence at trial on prong one was insufficient, and that he should not be deprived of his parental rights solely because of his incarceration.

The analysis in the trial court's oral decision is not particularly detailed concerning the father. The court did rely upon and emphasize the father's incarceration, stating, among other things, "he has harm[ed] and continues to harm these children by his absence, his anti-social behavior, the fact that he's in jail and will continue to be in jail."

The present evidential record on prong one as to the father is vague and uninformative in many respects. As we noted, supra, the Court in L.A.S. identified several factors, which were subsequently repeated in R.G., for courts to consider when evaluating how a parent's incarceration impacts the termination analysis. The Court reiterated in R.G. that this multi-factor analytical approach "reflects New Jersey courts' historic commitment to fact-sensitive analyses when deciding termination of parental rights cases." R.G., 217 N.J. at 556.

Based on L.A.S. and R.G., the considerations under prong one for an incarcerated parent can generally be divided into two sets of considerations: (1) the nature and circumstances of the underlying crime for which the parent was incarcerated; and (2) the parent's relationship with the children before he or she was incarcerated and then afterwards.

The record from the September 2016 trial, and the ensuing November 2017 remand hearing, is sparse about the circumstances surrounding the father's

17

incarceration.  The record was not "based on a broad inquiry into all the circumstances bearing on incarceration and criminality."  L.A.S., 134 N.J. at 143.

The father vaguely stated in his psychological evaluation that he was incarcerated because of an incident in which he fled from the police.  The proofs in this case do not contain the criminal record of the father or a judgment of conviction.  He maintains that the May 2010 incarceration is the first time he has been incarcerated, although he admits that he had been arrested several times in the past.  The father informed the evaluator that his previous arrests were for unspecified drug possession, probation violations, and one "gun charge."

The Division has not pointed to any specific evidence in the record that meaningfully indicates how any of the father's past criminal offenses bear upon his alleged parental unfitness.  See, e.g., L.A.S. 134 N.J. at 143 ("We conclude that the nature of the underlying crime giving rise to incarceration is relevant in determining whether parental rights should be terminated, because it may bear on parental fitness.").

To be sure, "crimes of abuse against one's own children . . . ordinarily warrant[] termination of parental rights."  Id. at 141.  However, even crimes "not involving a parent's direct victimization of the child, may bear on parental

unfitness" because those crimes "may be indicative of serious personality flaws and emotional instability." Id. at 142. See id., at 143 (finding the father's lengthy incarceration for committing a brutal first-degree murder "militates powerfully against his fitness as a parent.").

That said, the sparse record provides little insight with respect to this consideration. Although we do not minimize the seriousness of the father's imprisonment, the offenses for which he is currently incarcerated (apparently including the offense of eluding a police officer) do not seem to directly bear on his parental fitness, other than his physical separation from the children.

As to parental performance before incarceration, the record shows the father, the mother, and the two older boys did live together, albeit briefly, before the father was imprisoned. However, because both boys were very young when the father began his prison term,[4] the extent of the father's relationship with them, and his level of involvement as a parent, is not illuminated by the record. See, e.g., R.G., 217 N.J. at 536 (noting the father did "every day father stuff," such as changing his daughter's diapers, feeding her, and taking her to the doctor before he was incarcerated).

---

[4] Ian was approximately two years old at the time and John was less than a year old.

A-1840-17T2

The record is likewise unenlightening as to the extent to which the father's relationship with his two sons has been maintained while he has been in prison. The mother indicated that she had communicated with the father about the children while he was in custody. The father maintains that the mother brought the two boys to visit him on Christmas Day in 2013. C.W. also stated the father was a "good guy," and that if she was physically able to, she would have taken the two boys to visit him in prison. The father also indicated that he had been "in touch" with C.W., who updated him on the status of the boys.

The extent and frequency of the communication between the father and Ian and John is not adequately revealed by the present record. The Court in R.G. noted that the father did not want his daughter to visit him while he was incarcerated, but he communicated with the child's mother about the child's well-being before she was removed. The father in R.G. also wrote and called his daughter from prison. Id. at 560. The Court noted the father "increased his efforts" and contacted the daughter when she was removed from the mother's care. Ibid.

Here, there are at least some indicia that the father became more concerned about his sons when he learned that the Division was seeking to terminate his parental rights. Although the father had been aware of the

Division's involvement earlier, he may well have reasonably believed at that time that Ian and John were safely in the care of C.W., and thus he was not as worried about their well-being.

Indeed, when a Division caseworker informed the father that the goal for the boys had changed from reunification to adoption, the father asked if the mother had a chance of getting the boys back. When the caseworker responded that she was unsure, the father inquired about C.W., explaining that he would "love" for C.W. to take the boys because they have a "great relationship" with her. The father also asked the caseworker to reach out to his mother and sister to see if they could help C.W., and informed the caseworker that he loves his children and wants to be a part of their lives, if possible.

After the two boys were removed the second time, and the Division proceeded with a plan for adoption, the father presented himself as a competing future plan for the boys. He relied in his plan upon the assistance of other persons until such time as he becomes eligible for parole. Toward that end, the father provided the names of potential relatives who could take the boys. The father also requested that the boys be allowed to visit him in prison, which they did several times.

A-1840-17T2

On the whole, the record is murky and uninformative as to how the father's criminal conduct and his performance as a parent before and during incarceration has harmed and will likely harm the two boys, aside from the bare fact of his incarceration. Although we recognize that the father's confinement makes it difficult for him to function as a parent, we stress that his incarceration alone is not enough as a matter of law to satisfy prong one of the best interests test. See R.G., 217 N.J. at 556; L.A.S., 134 N.J. at 136-37. The trial court's finding on prong one accordingly must be vacated, as there presently is not adequate and substantial credible evidence to support it.

We turn to prong two as to the father. The Division has failed to prove by clear and convincing evidence that the father is unwilling or unable to remediate the harm his incarceration causes Ian and John. As discussed in more detail below, the services provided to the father were lacking. Even so, the father informed the evaluator that he had participated, on his own volition, in substance abuse treatment, anger management programs, parenting skills training, and Narcotics Anonymous while incarcerated. The father also earned his GED while incarcerated, and informed the evaluator that he plans to get his commercial driver's license after he is released. After the father is released, he intends to

move in with his mother. He believes, with the help of his mother and other relatives, that he can care for Ian and John.

The father's actions, done without the aid or involvement of the Division, are indicative of his willingness to eliminate the harm his incarceration has caused Ian and John. Not only has he participated in various prison programs, he also plans on caring for the boys when he is released, and acknowledges that the best interest of his sons is to be in the care of a family member.

As noted, the father also requested that Ian and John visit him in prison, which the Division took several years to facilitate. Although discussed in more detail below, the visits between the father and the sons were overwhelmingly positive, as noted by the Division's caseworker, Dr. Singer, and the boys' resource parent who noticed a change in their behavior after they visited. One case note states that during the first visit, the boys appeared happy to see their father, and the father "was in tears throughout the visit." The report indicated that the father asked for photographs of the boys, that he played appropriately with them, and told them to behave in school. The father also asked the caseworker if he could have the boys' address so he could write to them.

In the bonding evaluation between the father and the two sons, Dr. Singer observed that the "children were excited to see their father. All 3 individuals

were very verbal . . . . Eye contact was appropriate and extended. Smiling and laughter were spontaneous and plentiful. [The father] hugged the children periodically throughout the session." Dr. Singer also noted that the boys wanted to spend extra time with their father after the session ended. Ultimately, Dr. Singer concluded that severing the relationship between the father and Ian and John would likely result in a "significant, negative reaction" because the boys see their father as a "significant figure in their lives."

On the whole, we conclude the present record is inadequate to support the trial court's findings as to the father on prong two. We vacate that finding, without prejudice to a fuller and updated development of the record to address the considerations enumerated in L.A.S. and R.G.

V.

We turn to the mother on prongs one and two. The trial court did not err in finding that the Division met its burden of proof concerning the mother with respect to those prongs. The mother's multiple psychotic incidents placed Ian and John at risk of harm. She subsequently failed to address and resolve her serious mental illness as evidenced by her later repeated psychotic episodes several of which resulted in hospitalization. She also failed to take sufficient advantage of the services the Division provided.

The trial court explicitly stated that it was not punishing the mother for her mental illness. However, due to her ongoing erratic behavior, Ian and John already had experienced great instability and trauma.

During the remand hearing, the trial court reevaluated its original application of the best interests test as to the mother, and removed from its analysis – in accordance with T.U.B. – the hearsay statements that had been made by Ian and John. Upon doing so, the court found the Division's proofs were still adequate. The court observed that the mother had a long-standing history of mental health problems, which she was still experiencing in the year preceding the original guardianship trial. The court noted that Eric had been removed shortly after his birth, and that the two older children, Ian and John, had been exposed to the mother's episodes of mental illness.

The court found it significant that the three experts who testified at trial were unanimous that the mother was presently incapable of caring for the children, and that immediate reunification with her posed a risk of harm to the children. As the court noted, in addition to the mother's mental health issues, she also suffered from drug use, had inconsistent employment, and unstable housing. She lacked stability for herself and, as a result, could not provide stability or permanency for the children.

A-1840-17T2

The trial court specifically found that Dr. Esquilin's suggestion that the mother be provided with more time to correct her parenting problems was not credible. Rather, the court reasonably determined from the evidence that there was no realistic possibility that the mother would be able to provide a safe environment for the children in the foreseeable future. The court further recognized that the mother had not provided any evidence of her employment.

We reject the mother's argument that the court only relied upon the attempted drowning incident, and her subsequent stipulation that she harmed the children in violation of Title 9, when making its determination. The trial court clearly considered more than the near-drowning event in its analysis of the mother.

Although the mother was briefly reunified with the children in December 2014, she intentionally misled the Division by not disclosing her pregnancy with Eric. This time period was punctuated with her inconsistent participation in mental health treatment. After the children were removed from the mother as a result of the June 2015 incident, she continued to refuse mental health treatment and she experienced an additional psychotic episode when she ran through the streets naked and, once again, became homeless. The mother continued to express a disinterest in mental health treatment, as noted in her evaluations with

Drs. Singer and Gutierrez in February 2016.

Case law instructs that prong one can be satisfied by a showing by the Division that serious psychological damage could occur to the children as a result of a parent's actions or inaction. In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992). Moreover, the first prong can be satisfied by showing the potential for emotional or psychological harm resulting from a parent's behavior. Ibid. Here, the mother's persistent refusal to obtain mental health treatment led to several psychotic breaks, and placed the children at a direct risk for harm when they were in her care.

According to Dr. Singer, the mother lacked a basic understanding of childcare, despite having participated in a parenting skills course. By May 2015, the mother was using marijuana and continued to do so throughout the time of trial. She also delayed her participation in therapy. The court appropriately considered the broad range of the mother's behavior, including her drug use and continued resistance to mental health treatment. All of these shortcomings support the court's findings on prong one.

The second statutory prong as to the mother was also clearly established by the trial proofs. The factual and expert evidence in this case reasonably supports the trial court's conclusions on this prong.

The mother's aforementioned refusal to participate in mental health treatment, and forego abusing marijuana, as well as her unstable lifestyle, demonstrates her unwillingness to eliminate the harm facing all three children. For example, her behavior resulted in the removal of Eric, who has now lived the majority of his life with his foster mother with whom he is bonded. As we have also described, the mother's lack of mental health treatment led to additional episodes demonstrating her mental instability.

We also reject the mother's arguments that the trial court terminated her rights merely because of her status as a person having a mental illness. The court did not rest on a status-based rationale. The record reflects the mother's continued resistance to mental health treatment, in combination with her drug use and transient lifestyle, caused harm to the children. Hence, it reasonably supported the court's finding that she was unwilling to eliminate the harm that the children faced, and was not based on her status alone.

As a matter of law, the mother's ongoing refusal to obtain mental health treatment was relevant to the likelihood that she would obtain proper treatment in the future. As we noted in N.J. Div. of Youth & Family Servs. v. I.H.C., 415 N.J. Super. 551, 576 (App. Div. 2010), a parent's past conduct can be relevant in determining his or her future conduct. See also J.C., 129 N.J. at 10 (stating

28

that parent's past neglect can indicate whether parent's prior unresolved issues would manifest again).

Moreover, the trial court reasonably considered and relied upon expert testimony in finding under prong two that the children were at future risk of harm if they were placed in the mother's care. A court in a termination case is permitted to rely on the testimony of a qualified expert who evaluated the children's relationships with the parents and an alternative caregiver. J.C., 129 N.J. at 19. Also, a court can rely upon expert testimony to determine the possibility that harm could occur if the family was reunified and whether harm would befall the children if the bonds with the resource family were severed. Ibid.

Here, the trial court reasonably accepted as credible the testimony of Drs. Singer and Gutierrez, who opined that the mother was unable to parent the children successfully, that her continued relationship would cause the children harm, and that she was not a viable parenting option for the foreseeable future. The experts were in agreement, moreover, that the youngest son Eric was bonded to his foster mother. According to Drs. Singer and Gutierrez, the mother's ongoing struggles with drug use, transience, and mental health problems prevent her from successfully parenting. The children each needed stability in their lives

that the mother could not offer for the foreseeable future.

In sum, there was clear and convincing evidence in the record to support the court's finding on prong two that the mother was unable and unwilling to correct the circumstances that led to the Division's initial and ongoing involvement. We affirm that sound determination.

VI.

We now turn to the third prong of the statutory termination factors as to both parents. As we have noted above, this prong requires the Division to prove that it made "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside of the home and the court has considered alternatives to the termination of parental rights[.]" N.J.S.A. 30:4C-15.1(a)(3); K.H.O., 161 N.J. at 353. This requirement can be separated into two distinct components: (1) reasonable efforts to provide services, and (2) adequate consideration of alternatives to termination.

We agree with the trial court that the first component was proven at trial as to the mother. However, for the reasons we will amplify, the case should be remanded with respect to the first component as to the father and the second component as to both parents.

As to the first component of the third prong, we are mindful that the

A-1840-17T2

Division is obligated to offer "reasonable efforts," aimed at the possible reunification of the family, which generally consist of:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
>
> (3) informing the parent at appropriate intervals of the child's progress, development and health; and
>
> (4) facilitating appropriate visitation.
>
> [N.J.S.A. 30:4C-15.1(c).]

The Division's success with regard to this prong is not measured by the parent's actual participation in services. In re Guardianship of D.M.H., 161 N.J. 365, 390 (1999). As the Supreme Court has observed, "even [the Division's] best efforts may not be sufficient to salvage a parental relationship." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 452 (2012).

The record is replete with proof that the Division offered and provided the mother with an abundant range of services to address her mental health issues. Among other things, those services included psychological and psychiatric evaluations, individual therapy, and medication monitoring. The mother argues that the Division should have offered her more tailored mental health treatment,

and referred her to specialized counseling. However, the evidence does not show the mother would have followed through with such a referral or participated in improving her mental health. See A.G., 344 N.J. Super. at 437 (noting that a parent must actively work to improve himself or herself through the services offered by the Division).

As to services relating to the mother's drug use, the record reflects the Division provided her with drug assessments and drug treatment. She unfortunately failed to benefit from her treatment, as evidenced by her continued abuse of marijuana up to the time of the guardianship trial.

Additionally, the Division supplied the mother with a plethora of services aimed at facilitating reunification, such as family team meetings, visitation, couples' counseling, transportation assistance, assistance to help her receive welfare benefits, housing assistance benefits, parenting skills courses, and grant assistance that provided her with cash, food stamps, Medicaid, and housing. Although the mother argues the Division did not provide her with adequate mental health services or housing assistance, the record demonstrates to the contrary.

We also reject the mother's argument that the Division violated the Americans with Disabilities Act ("ADA"), which prohibits discrimination

against persons with disabilities. 42 U.S.C. §§ 12101 to 12213. Without citing to case law or connecting the facts of her case to specific provisions under the statute, the mother asserts in conclusory fashion that she "qualifies under the ADA for services." She does not specify the services to which she refers.

Although the mother suggests that she is entitled to "reasonable modifications" of Division services to accommodate her alleged disability, she does not specify the accommodations that she was allegedly denied. Moreover, she does not explain how the programs that she was referred to by the Division needed modification. Nor does she cite to any requests for either services or accommodations that she actually made and the Division refused. Her ADA argument simply lacks evidential support and thus fails.

Turning to the father, we recognize the trial court's oral opinion did not explicitly refer to the father concerning the "services" aspect of the third prong. The trial court instead made a more generic finding that it was "satisfied the Division has made reasonable efforts" with regard to the overall case.

The Division maintains that the father did not request any services until the case goal changed to adoption. The Division questions what additional services could have been provided to him in light of his incarceration. Courts have recognized that providing services to incarcerated parents "is difficult and

may be futile." R.G., 217 N.J. at 562. However, the Supreme Court has instructed that "the Division should not avoid providing services to all incarcerated persons, regardless of their seeming unwillingness to improve their parental fitness." Ibid. The Division cannot ignore or disregard a non-primary caretaker that may be able to step in for a parent who cannot care for a child himself. D.M.H., 161 N.J. at 393.

Although the father here was not the primary caretaker of Ian and John, the Division paid only what appears to be cursory attention to him during its involvement in this litigation. Although the father was on notice of the removal proceedings, it is unclear from the present record if the Division kept the father reasonably updated on his sons' progress, development, or health. See N.J. Div. of Youth & Family Servs. v. L.M., 430 N.J. Super. 428, 450 (App. Div. 2013); see also N.J.S.A. 30:4C–15.1(c) (requiring the Division to "inform the parent at appropriate intervals of the child's progress, development, and health.").

As we have noted, the Division facilitated several visits between the father and the two boys in early 2016, but those visitations apparently stopped after only a few months, without explanation. The record is not clear as to whether Division reasonably waited before facilitating such visitation. Specifically, it is unclear why the Division did not facilitate visitation between the sons and the

father before the case goal changed to adoption, and before the father had to specifically request the court to order visitation.

As we have noted, the boys were involved with the Division for approximately three years before visitation was ultimately facilitated. C.W. indicated that she would have taken the boys to visit their father herself if she was physically able. There is no basis to presume that the Division could not have facilitated that visitation when the boys were in C.W.'s care for extended periods of time.

There is evidence that the visitations with their father had a positive impact on the boys. Dr. Singer recommended that the visitation continue throughout the litigation. Yet, there is no indication that the boys have seen their father since 2016.

There is no evidence that the Division provided a means for the father to communicate with his sons. There is no proof the Division provided him with a telephone calling card or updated addresses where he could send the boys letters. R.G., 217 N.J. at 562. Indeed, during the first visit, the father specifically asked for caseworker if he could have the boys' address so he could send letters.

Lastly, although the father completed numerous prison programs, apparently including a parenting class, there is no indication that the Division compared the content of the in-prison programs completed by the father with the programs offered by the Division. If the in-prison programs were insufficient, the Division should have reasonably attempted to provide the father with a means to complete other Division-approved programs.

The other component of the third statutory prong requires adequate consideration of potential "alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3); see N.J. Div. of Youth & Family Servs. v. K.L.W., N.J. Super. 568, 580 (App. Div. 2011). As part of this obligation, the Division must explore relatives or other potential alternative caregivers identified by the parents. See generally, N.J.S.A. 30:4C-12.1, N.J.A.C. 3A:5-3.1(b) (discussing the Division's obligations to consider alternative caretaker options). As we noted in N.J. Div. of Youth & Family Servs. v. J.S., 433 N.J. Super. 69, 81 (App. Div. 2013), "[a]n important objective of the statutory scheme is the 'prompt identification of relatives and notice to them of the results of the investigation and the potential for termination if the child remains in foster care.'" (quoting N.J. Div. of Youth & Family Servs. v. K.L.W., 419 N.J. Super. 568, 580 (App. Div. 2011)).

Here, the record indicates the Division explored and ruled out several different relatives of the mother and other potential alternative placements, including C.D., the grandmother of the mother's paramour, the mother's cousin, C.H., the mother's mother, H.A.

The Division also explored the father's brother, J.M., and his mother, J.M. The father's mother initially indicated a willingness to take Ian and John, but later withdrew herself as an option because of an illness, although there is no letter to confirm. The father's brother also indicated that he and his fiancé were willing to take the boys, but apparently did not complete the necessary requirements in time.

At the September 2016 trial, the Division's caseworker testified that the father's brother had been ruled out, but acknowledged that he had not yet been sent a rule-out letter. In addition, the mother's god-aunt, P.K., had been a placement for Ian and John, but she thereafter requested the Division remove those boys from her care because of their behavioral issues.

At the end of the September 2016 trial, and again in his remand decision in November 2017, the trial judge was satisfied that the Division had made adequate efforts to consider potential alternatives to termination. However, since that time, several critical developments have occurred.

First, the court-approved plan of "select home adoption" for Ian and John has not yet yielded promising results. According to the Division's update and the orders furnished from the trial court's "FC" docket, Ian has been in a group home since July 2018, where he continues to await a more permanent placement. Ian personally wishes to be adopted by C.W. John, meanwhile, is separated from Ian and living in a resource home where he was placed about a year ago. However, due to John's behavioral issues, the resource parent does not yet wish to adopt him. More favorably, Eric reportedly continues to do well in the pre-adoptive resource home, where he has been since shortly after his birth.

The other momentous development, which we have already mentioned, is C.W.'s recent action in coming to the Division and expressing her interest in serving again as caretaker for the children. Her apparently self-initiated action is documented in the most recent March 2019 order from the "FC" docket, which was supplied to us post-argument by the Division's attorney.

It is unclear exactly what potential role, if any, C.W. might feasibly undertake in the future, and how many of the children she may be able and willing to take into her home. We recognize C.W. has cared for Ian and John twice in the past, which ended both times in those children being returned to the Division's care and custody. We also appreciate that C.W., an amputee, has

health problems of her own.  Her physical capability to care for any of her grandsons is not clear from the existing record.  C.W. has also had friction with the boys' mother in the past.

That said, there is no documentation in the record that the Division ever issued a "rule-out" letter to C.W.  In addition, we note as a matter of general policy, the Family Part strives to place siblings and half-siblings in the same household when feasible and in the children's best interests.  See, e.g., In re D.C., 203 N.J. 545, 563-66 (2010).  Hence, the current placements of Ian and John, who remain separated from one another, remain less than optimal, and provide further reason to explore a potential future placement of perhaps both boys with C.W.

For these reasons, in light of the gaps in the record concerning other relative caretakers and the most recent post-judgment developments, we remand this case to the trial court for further consideration as to alternatives to termination and, in particular, the current viability of C.W.  See, e.g., N.J. Div. of Youth & Family Servs. v. T.S., 417 N.J. Super. 228, 231 (App. Div. 2010) (recognizing the authority of this court to remand a termination case where there are material post-judgment developments that affect the "underpinnings" of the trial court's decision as to the statutory factors).

Because these matters necessarily affect a proper and full analysis of the children's "best interests" under prong four that prong must also be re-evaluated on remand. We therefore need not comment about that prong at this time.

VII.

The remand proceedings shall be completed within ninety days, unless reasonably extended by the trial court with the consent of all counsel. The court shall have discretion on remand to permit additional discovery, and the presentation of relevant supplementary evidence and testimony.[5] The Assignment Judge, who coincidentally has been presiding over the post-guardianship "FC" proceedings in this matter, shall designate which trial judge in the vicinage will preside over the remand. Any aggrieved party may file a new appeal from the remand determination.

VIII.

The final judgment of guardianship is affirmed as to the youngest son, Eric. As to Ian and John, the trial court's decision is vacated as to the father as

---

[5] At oral argument on the appeal, counsel indicated a receptivity to the Assignment Judge herself presiding over the remand proceedings, if she is willing to do so, given her familiarity with the case, most recently in presiding over the FC proceedings. We do not, of course, limit the Assignment Judge's prerogatives in assigning the remand case.

A-1840-17T2

to all four prongs, affirmed in part as to prongs one and two as to the mother, and remanded in part as to prongs three and four. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION